# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

      Plaintiff,

      v.

    Case No. 17-2453-JAR

UPS GROUND FREIGHT, INC. d/b/a UPS
FREIGHT, et al.,

      Defendants.

## MEMORANDUM AND ORDER

Plaintiff Equal Employment Opportunity Commission's ("EEOC") remaining claim in this case asserts disability discrimination on behalf of Thomas Diebold against his former employer UPS Ground Freight, Inc. d/b/a UPS Freight ("UPSF").[1] This claim arises under the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA").[2] Before the Court are the parties' cross-motions for summary judgment (Docs. 116, 165). The motions are fully briefed and the Court is prepared to rule. As described more fully below, the Court denies both motions for summary judgment.

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[3] In applying this standard, the court views the evidence and all reasonable inferences therefrom in

---

[1]Teamsters National UPS Freight Negotiating Committee is a defendant under Fed. R. Civ. P. 19(a) as to Count II only. This Court previously granted the EEOC's motion for judgment on the pleadings as to Count II, so UPSF is the only remaining defendant. *See* Docs. 31, 159 n.1.

[2]Pub. L. No. 110-325, 122 Stat. 3553 (codified as amended at 42 U.S.C. §§ 12101–12213).

[3]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

the light most favorable to the nonmoving party.[4] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[5] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6] An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[7] The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[8] Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[9]

To prevail on a motion for summary judgment on a claim upon which the moving party also bears the burden of proof at trial, the moving party must demonstrate "no reasonable trier of fact could find other than for the moving party."[10] "Where, as here, the parties file cross-motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[11] Cross summary judgment motions should be evaluated as two

---

[4]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[5]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[6]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[8]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[9]Fed. R. Civ. P. 56(c)(4).

[10]*Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).

[11]*James Barlow Family Ltd. P'ship v. David M Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

separate motions.[12]  But to the extent they overlap, the Court can address the legal arguments together.[13]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II.    Uncontroverted Facts

Most of the material facts in this matter are stipulated in the Pretrial Order.  To the extent the following facts are not stipulated, they are uncontroverted.  The Court does not consider facts presented by the parties that the record does not support or that are immaterial to resolution of the motion.  Nor does the Court consider legal arguments or conclusions recited in the parties' statements of fact.

### Diebold's Stroke

Thomas Diebold worked as a road driver for UPSF starting in 2006.  Diebold had a "cerebrovascular accident," or stroke, on January 21, 2013, and was hospitalized for approximately two days.  Diebold's spouse reported to his UPSF supervisors that Diebold had a stroke requiring hospitalization and that he was unable to work.  Diebold's stroke affected his neurological and cardiovascular systems.  He had weakness and numbness on his right side, and had difficulty holding eating utensils.  According to his physician, the stroke "significantly

---

[12]*Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

[13]*Ross v. Rothstein*, 92 F. Supp. 3d 1041, 1048 (D. Kan. 2015) (citing *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010)).

[14]*Celotex Corp. v. Catrett*, 477 U.S. 317,  327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

impacted his Right Upper Extremities (RUE) including weakness, numbness, dystaxia, etc., in his right arm and hand."[16]  Due to the "consequences on Diebold's self-care, arm and hand grip strength, working, etc.," several specialists were prescribed for his care, including physical and occupational therapy.[17]

After his release from the hospital, Diebold reported to his supervisors that he would need therapy before returning to work.  Diebold's manager, Jeff Wry, told Diebold to call when he was ready to go back to work.  Diebold was off work for approximately three weeks to do in-clinic physical and occupational therapy.  Occupational therapist testing and observations showed that Diebold had deficits including right-side weakness for self-care and transfers, decreased endurance for transfers and safety, decreased ability for independent self-care, and decreased functional coordination.  Nonetheless, on February 6, 2013, Diebold's personal physician released him back to work with no restrictions.  Diebold returned to work with UPSF on February 10, 2013, to the same road driver position he had before his stroke.  He performed the functions of the road driver position, did not require help from UPSF, and there was no complaint or concern by UPSF that Diebold was unable to perform his job.

UPSF's road driver position required a commercial driver's license ("CDL") and a valid medical examiner's certificate ("MEC").  U.S. Department of Transportation ("DOT") regulations require interstate drivers to submit to periodic medical examinations to obtain a MEC.  DOT guidance recommends a one-year waiting period after a "transient ischemic attack/minor stroke" for commercial drivers "[b]ecause the recurrence rate of ischemic

_____

[16]Doc. 164-10 ¶ 8.

[17]*Id.* ¶ 9.

neurological symptoms is highest during the first year."[18]  According to this guidance, "[a]

Transient Ischemic Attack ("TIA") is an episode of focal neurological dysfunction reflecting

inadequate blood supply to one portion of the brain.  The attack usually lasts more than a few

seconds but less than 20 minutes," and a "minor stroke is a cerebrovascular episode in which the

patient completely recovers over a period greater than 24 hours or in which minor neurological

residuals remain."[19]  Similarly, the DOT Federal Motor Carrier Safety Administration Medical

Examiner Handbook recommends a one-year waiting period for stroke sufferers not at risk of

seizure.

On April 29, 2013, during his periodic driver's medical examination, despite being told

that he "passed" the physical, Diebold's MEC was not reissued because he disclosed he had

suffered a stroke.[20]  The DOT examiner noted that Diebold could not drive until his next physical

on January 23, 2014, but that he could work on the dock.  Diebold was never informed that he

lost his CDL.[21]

### *UPSF Policy and Practice for Employees Required to Drive*

Pursuant to UPSF policy in 2013, when "an employee [in the Kansas City terminal] in

any job classification requiring driving," including Road Driver, Local Driver, and Jockey with

CDL, lost their CDL or their DOT MEC, that employee was prohibited from driving in any of

those jobs until regaining their CDL and/or DOT MEC.  Diebold promptly reported to his

---

[18]Doc. 164-8 at 22.  This July 1988 Report was prepared by the DOT's Conference on Neurological Disorders and Commercial Drivers, after which "neurology specialists, occupational health physicians, and motor carrier industry experts reviewed and proposed modifications to the neurological regulations and recommended test procedures and decision matricies designed to guide neurological examinations."  *Id.* at 3.

[19]*Id.* at 22.

[20]Doc. 171 at 45:2–7.

[21]UPSF objects that Diebold is not competent to testify about the status of his CDL.  The Court overrules this objection and finds that under Fed. R. Evid. 602, this fact is admissible to the extent Diebold attests to his personal knowledge of the status of his CDL.  Defendants present no evidence to controvert Diebold's assertion.

managers at UPSF on April 29, 2013, that the medical examiner did not renew his MEC. Therefore, Diebold was not permitted by UPSF to work as a road driver without a MEC pursuant to DOT regulations because the job included interstate driving. There were no accommodations that could be made to allow Diebold to perform the essential functions of UPSF's road driver job without a MEC.

Although Diebold still desired to drive after losing his MEC, he was desperate for work and pay and sought hours as dockworker, pursuant to what he understood was UPSF's policy for those unable to drive, including those drivers who were arrested for or convicted of driving under-the-influence ("DUI"). Article 21, § 2(a) of the 2008–2013 collective bargaining agreement ("CBA") states:

> When an employee in any job classification requiring driving has his/her operating privilege or license suspended or revoked for reasons other than those for which the employee can be discharged by the Company, a leave of absence without loss of seniority, not to exceed one (1) year, shall be granted for such time as the employee's operating license has been suspended or revoked. The employee will be given available work opportunities to perform non-CDL required job functions.[22]

Wry believed that Article 21 § 2(a) permitted Diebold to work on the dock after he lost his MEC; Diebold also believed he could work on the dock. On or about May 6, 2013, Diebold was approved by Wry to start working on the dock starting on Monday, May 13, 2013, as a full-time dock worker. But on May 10, 2013, Diebold was informed that UPSF would not permit him to work on the dock as a full-time dock worker after all. UPSF interpreted Article 21 § 2 as applying to those whose CDL was "suspended or revoked" due to, for example, a DUI, but not to

---

[22]Doc. 166-2 at 41–42.

those who are medically disqualified. Therefore, UPSF took the position that this provision therefore did not apply to Diebold.

Had Diebold worked on the dock as "an employee with Diebold's seniority, in any job classification requiring driving"[23] who received a DUI from May 13, 2013 through January 4, 2014: (1) there would have been fifty hours per week available to him; (2) he would have earned thirteen paid vacation days; and (3) working only "available hours," he would not have conflicted with the seniority of any UPSF employee. Had Diebold worked on the dock the 50 hours each week that UPSF admits that he would have been able to work had their policy permitted it, earning the admitted full-time dock worker pay based on his years of service, the CDL differential, and the semiannual CBA pay increases, and getting the time-and-a-half for time worked over forty hours, Diebold would have earned $53,591.35. The value of the thirteen vacation days that UPSF admits Diebold would have earned from May 13, 2013–January 4, 2014, was $2,745.60.

### UPSF's ADA Process

Diebold contacted Carla Beazley at UPSF on May 16, 2013, and told her he felt that he was being discriminated against because the company would not allow him to return to work on the dock. Beazley relayed the phone call to UPSF decisionmakers for guidance, and explained that Central Region Labor Manager Phil Bowen told her that "our current [union] contract states that [Diebold] is medically disqualified for a year. However, our new contract which will take effect later this Summer, would in fact permit him to work the dock."[24] Indeed, Bowen testified

---

[23]Doc. 159 ¶ 22.

[24]Doc. 164-9 at 2.

at deposition that "the company's position was, because the union contract did not speak to Mr. Diebold's situation, he could not work on the dock following his stroke."[25]

Diebold provided a doctor's note to UPSF, dated May 17, 2013, from the same physician's office that conducted his DOT medical examination, that stated he "[m]ay work on Dock."[26]  Also on May 17, 2013, Sharon Elliott, who is UPSF's Occupational Health Nurse, advised Diebold to participate in UPSF's ADA process and Diebold requested that an ADA file be opened.

UPSF's 2012 ADA Procedural Compliance Manual provides that its ADA accommodation process has ten steps:

> Step One:      Commence the Process
> Step Two:      Gather Medical Information
> Step Three:    Evaluate Whether the Employee May Have a Disability
> Step Four:     Notify the Employee
> Step Five:     Meet with the Employee (Hold Checklist Meeting)
> Step Six:      Identify Potential Reasonable Accommodations (Complete Written Checklist)
> Step Seven:   Evaluate Appropriate Accommodations (ADA Committee Meets)
> Step Eight:    Bargain with the Union (when an accommodation is identified for a union employee)
> Step Nine:    Notify the Employee
> Step Ten:     Close the File[27]

Whether the employee is disabled is determined at Step 3.  That determination is logged on a UPSF form entitled Accommodation Request Activity Log ("ADA form"), on "Activity 6: Evaluation of the Employee's Condition Concluded."[28]  The ADA form provides three options:

[25]Doc. 164-4 at 33:20–25, 50:21–51:20.

[26]Doc. 166-6.

[27]Doc. 164-6 at 51–52.

[28]*See, e.g.*, Doc. 164-7 at 4.

"Not a Covered Disability," "Insufficient Medical Information," or "May be Eligible for a Reasonable Accommodation."[29] If no disability is found at Step Three, UPSF is to "close the file."[30] If UPSF determines that the employee has a condition that may qualify as a disability, it proceeds to the next step of the process. On Diebold's ADA form, UPSF marked the third option, that "[Diebold] May be Eligible for a Reasonable Accommodation."[31]

Steps Six and Seven of the ADA process require UPSF to determine if Diebold was a "qualified individual with a disability." On "Activity 10: Committee Conference Held," the ADA form provides two options: "Employee may be a Qualified Individual with a Disability. Describe Identified Reasonable Accommodation," or "Employee was NOT a Qualified Individual with a Disability."[32] On Diebold's ADA form, UPSF marked that Diebold "may be a Qualified Individual with a Disability," stating "None" next to the request for a description of reasonable accommodation.[33] The parties stipulate that during the Accommodation Conference, UPSF determined that Diebold could work as a dock worker with or without a reasonable accommodation.

On December 6, 2013, UPSF offered Diebold an accommodation pursuant to its ADA process which would have him work as a part-time (casual) dock worker for $22.355/hour. UPSF's offer letter states that "nothing in this agreement is to be construed as an admission by UPS Freight that Employee is 'disabled' as a matter of law."[34] The pay rate ($22.355) that UPS Freight offered Diebold for part-time (casual) dock work was 86.3% of the pay rate that "an

---

[29]*Id.*

[30]Doc. 164-6 at 55.

[31]Doc. 164-7 at 4.

[32]*Id.* at 6.

[33]*Id.*

[34]Doc. 166-7 at 2.

employee with Diebold's seniority, in any job classification requiring driving," who received a DUI, would have received at that time ($25.90) for the same work. Diebold rejected the accommodation offer.

On December 31, 2013, UPSF allowed Diebold to submit to another DOT physical examination, and he obtained a valid MEC. UPSF put Diebold back to work as a UPSF road driver on January 5, 2014, after Diebold obtained a valid MEC and became reauthorized under DOT regulations to drive interstate and perform the road driver position.

Diebold voluntarily retired from UPSF effective August 2015.

## III. Discussion

The only remaining claim in this case is Count I, alleging disability discrimination under the ADAAA relating to how the 2008–2013 CBA was applied by UPSF to Diebold after his January 2013 stroke.[35] Under the ADAAA, an employer is prohibited from discriminating against "a qualified individual on the basis of disability."[36] The EEOC claims that UPSF had an express policy of treating disabled drivers differently than drivers who got a DUI with respect to, among other things, the ability to work on the dock, the pay rate for working on the dock, the receipt of CDL differential pay, and seniority. UPSF maintains that its decision to apply the CBA differently to Diebold as compared to employees who were arrested for or convicted of a DUI was based solely on Diebold's lack of a MEC, not because he was disabled as defined by the statute.

[35]The EEOC does not assert a failure-to-accommodate claim. Doc. 159 at 6 ¶ 40.

[36]42 U.S.C. § 12112(a).

Because the EEOC's claim in this case is based on discriminatory classification, the *McDonnell Douglas* burden shifting framework is inapplicable.[37] Plaintiff must still establish a prima facie case of discrimination, however.[38] To establish a prima facie case of discrimination, the EEOC must show that that at the time of the adverse employment action, (1) Diebold was disabled as defined under the ADAAA; (2) Diebold is qualified, with or without reasonable accommodation by the employer, to perform the essential functions of the job; and (3) Diebold was discriminated against because of his disability.[39] The Court first addresses UPSF's argument that the EEOC did not properly move for summary judgment on all elements of its discrimination claim. Next, the Court considers each element of the EEOC's disability discrimination claim in turn.

### A. Cross Motions

In its motion for summary judgment, the EEOC claims it has shown all elements of its disability discrimination claim as a matter of law. UPSF argues that summary judgment is appropriate in its favor because Diebold was not disabled as defined by the ADAAA. Although the EEOC moves for summary judgment on Count I in its entirety, it merely incorporates by reference its response memorandum to UPSF's motion for summary judgment as to the issue of whether Diebold is disabled, including its statement of additional facts that are cited to the record with particularity. UPSF was able to controvert these facts in its reply.

---

[37]*See Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) (finding direct evidence of discrimination where employer's decision was based on failed routine DOT medical evaluation); *see also Vannattan v. VendTech-SGI, LLC*, No.16-cv-2147-JWL, 2017 WL 2021475, at *2 (D. Kan. May 12, 2017) (declining to apply *McDonnell Douglas* where there was no dispute that the employee was terminated based on a color-vision deficiency).

[38]*Hawkins*, 778 F.3d at 883.

[39]*Adair v. City of Muskogee*, 823 F.3d 1297, 1304 (10th Cir. 2016); *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011).

UPSF objects that the EEOC did not properly move for summary judgment on the disability element of its discrimination claim. The Court disagrees. The EEOC was not required to copy and paste its entire response brief into its own summary judgment brief in order to properly preserve its moving arguments on these issues, and UPSF's cited authority does not support disallowing the EEOC's cross-reference in this case.[40] The Court therefore considers both sets of the parties' submissions regarding whether Diebold is disabled in evaluating the EEOC's motion for summary judgment and finds that the EEOC properly moved on this element. Nonetheless, the Court is mindful of the parties' differing burdens on summary judgment. Unlike UPSF, since the EEOC bears the burden of proof at trial, it must demonstrate that no reasonable trier of fact could find other than for the moving party for summary judgment to be warranted in its favor.

## B.      Disability

Under the ADAAA, "[t]he term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such impairment."[41] The 2008 amendments to the ADA make establishing a disability easier for plaintiffs and were intended to ensure that "the definition of disability . . . [is] to be construed in favor of broad coverage."[42]

---

[40]*See Delaney v. Deere & Co.*, 219 F.3d 1195, 1196 n.1 (10th Cir. 2000) (criticizing the non-moving party's incorporation by reference of affidavits, in contravention of the local rule that requires a concise statement of material facts that are cited to the record with particularity).

[41]42 U.S.C. § 12102(1).

[42]*Id.* § 12102(4)(A).

In this case, the EEOC abandoned its claim that Diebold was actually disabled at the time of the alleged adverse employment actions.[43]  Instead, the EEOC claims Diebold had either a record of a disability or that UPSF regarded him as disabled when the alleged discrimination occurred on two dates: (1) May 13, 2013, the first day he was denied a full-time dockworker position, and (2) December 6, 2013, when it offered to accommodate Diebold with a part-time dockworker position that would have paid Diebold less than drivers arrested for or convicted of DUI.[44]

## 1. Record of Disability

Under the applicable regulation, "[a]n individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."[45]  A record of disability "may be satisfied by a showing that the plaintiff had a disability in the past (even though he no longer suffered from that disability when the allegedly discriminatory action took place)."[46]  This provision is to be construed broadly and the inquiry "should not demand extensive analysis."[47]

### a. Impairment

The EEOC first must demonstrate that Diebold had a qualifying impairment, a question of law for the Court.[48]  The applicable regulations define physical or mental impairment as

---

[43]*See* Doc. 172 at 1.

[44]*See, e.g.*, *Carter*, 662 F.3d at 1142; *EEOC v. STME, LLC*, 938 F.3d 1305, 1314 (11th Cir. 2019) ("The relevant time period for assessing the existence of a disability, so as to trigger the ADA's protections, is the time of the alleged discriminatory act.").

[45]29 C.F.R. § 1630.2(k)(1); *see also Zwygart v. Bd. of Cty. Commr's of Jefferson Cty., Kan.*, 483 F.3d 1086, 1091 (10th Cir. 2007).

[46]*Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 40 (1st Cir. 2018).

[47]29 C.F.R. § 1630.2(k)(2).

[48]*Carter*, 662 F.3d at 1142 (citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003)).

"[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine."[49]  It is uncontroverted that Diebold suffered a stroke on January 21, 2013, and that Diebold's stroke affected his neurological and cardiovascular systems.

UPSF argues that a minor stroke is not an impairment, citing *Feldman v. Law Enforcement Associates Corp.*[50]  But the parties dispute whether Diebold's stroke should be characterized as "minor."  Diebold testified in his deposition that his doctors characterized it to him that way, but the medical records refer to it as "cerebrovascular accident" and "stroke."[51]  Moreover, this nonbinding case does not stand for the proposition that a minor stroke or TIA can never meet the definition of impairment under the ADA.[52]  In *Feldman*, the plaintiff went to the hospital claiming that he was possibly having a TIA.  Although he was admitted overnight for observation, he was discharged with no restrictions and his medical records stated only that he "may have had" a TIA.[53]  The plaintiff in that case argued that his TIA was a disability because it was an impairment that is episodic or in remission under 42 U.S.C. § 12102(4)(D).[54]  The district court rejected that argument, finding that a TIA is an "acute condition that is different from the more chronic conditions . . . that Congress intended to include within the definition of a

---

[49]29 C.F.R. § 1630.2(h)(1).

[50]955 F. Supp. 2d 528 (E.D.N.C. 2013), *aff'd*, 752 F.3d 339 (4th Cir. 2014).

[51]*See* Doc. 164-10.

[52]*See Scavetta v. Dillon Cos.*, 569 F. App'x 622, 624 (10th Cir. 2014) ("There is no 'per se' disability." (quoting 29 C.F.R. § 1630.2(j)(3)).

[53]*Feldman*, 955 F. Supp. at 538.

[54]*Id.*

disability through the enactment of this provision."[55]  The EEOC does not invoke 42 U.S.C. §

12102(4)(D) in this case.  And, unlike in *Feldman*, it is uncontroverted that Diebold suffered a

stroke on January 20, 2013, that he required physical therapy, and that his doctor placed

restrictions on him for almost three weeks following the stroke.

UPSF argues that even if Diebold suffered an impairment in January 2013, he was no

longer impaired by the time of the adverse employment actions.  The EEOC argues that even if

Diebold was not actually disabled on May 13 or December 6, 2013, on those dates he had a

history of or a perceived impairment due to his MEC restriction, which was solely based on the

January 2013 stroke that affected his neurological and cardiovascular systems.  The Court finds

that since the EEOC is no longer claiming that Diebold had an actual disability on the dates of

the alleged adverse employment actions, those are not the relevant dates for the impairment

analysis.  The parties stipulate that Diebold had a stroke that affected his neurological and

cardiovascular systems, caused his doctor to place a work restriction on him for a period of time,

and required physical therapy.  It is also uncontroverted that Diebold's MEC was not reissued

solely based on his stroke history.  No reasonable jury could conclude that Diebold was not

impaired in January 2013, and that his impairment included a heightened risk of future strokes.

Given that the DOT's one-year waiting period is based on the potential for stroke

recurrence, UPSF invokes regulatory guidance and caselaw that a person's predisposition to

illness or impairment does not meet the definition of impairment.[56]  That regulation draws a

distinction between physiological conditions that create a predisposition to illness or impairment

---

[55]*Id.*

[56]*See* 29 C.F.R. Pt. 1630 app. ("The definition of the term 'impairment' does not include physical
characteristics such as eye color, hair color, left-handedness, or height, weight, or muscle tone that are within
'normal' range and are not the result of a physiological disorder.  The definition, likewise, does not include
characteristic predisposition to illness or disease."); *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1111 (8th Cir. 2016)
(holding obesity is only a physical impairment if it results from a physiological disorder).

and other types of characteristics, such as weight, that create a predisposition to illness or impairment.[57]  But Diebold's stroke is not a characteristic that predisposes him to illness, such as height or weight.[58]  Diebold's stroke is a physical condition that increased his risk for subsequent strokes.  The EEOC has thus demonstrated that Diebold's underlying physiological *condition*, rather than a physical, psychological, environmental, cultural, economic *characteristic*, caused his increased risk of stroke recurrence.

### b.  Substantially Limited a Major Life Activity

Not every impairment constitutes a disability under the ADA.[59]  The impairment must have substantially limited one or more of Diebold's major life activities, a question of fact for the jury.[60]  Whether or not an impairment "substantially limits" a major life activity "is not meant to be a demanding standard," and "should not demand extensive analysis."[61]  Major life activities include, but are not limited to:

> (i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and
>
> (ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system.[62]

---

[57]29 C.F.R. Pt. 1630 app.

[58]*See, e.g.*, *Morris*, 817 F.3d at 1112 (explaining that weight is a physical characteristic unless it is outside the normal range and the result of an underlying physiological disorder).

[59]29 C.F.R. § 1630.2(j)(ii).

[60]*Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011).

[61]29 C.F.R. § 1630.2(j)(1)(i),(iii).

[62]*Id.* § 1630.2(i)(1).

The EEOC asserts that Diebold's stroke substantially limited self-care, eating, writing, lifting, gripping, and working.  It further asserts that Diebold's stroke affected the operation of two major bodily functions, neurological and cardiovascular.  It supports these assertions with declarations from Diebold, his physician, and his occupational therapist.  It is uncontroverted that Diebold's stroke affected his neurological and cardiovascular systems.  It is also uncontroverted that in the immediate aftermath of Diebold's stroke, he suffered deficits in the areas of self-care, decreased endurance for transfers and safety, and decreased functional coordination.

But UPSF disputes that Diebold's limitations rose to the level of "substantially limiting" Diebold's major life activities, which turns on whether the impairment "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."[63]  In making this determination,

> it may be useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity.[64]

Evidence addressing the condition, manner, or duration of Diebold's impairment could include "the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function."[65]

---

[63]*Id.* § 1630.2(j)(ii).  When an impairment is "'obvious,' or can be 'fathom[ed] without expert guidance,' courts generally do not require expert testimony" on this issue. *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 998 (10th Cir. 2019) (first quoting *Katz v. City Metal Co.*, 87 F.3d 26, 32 (1st Cir. 1996); and then quoting *Mancini v. City of Providence*, 909 F.3d 32, 39 (1st Cir. 2018)).

[64]29 C.F.R. § 1630.2(j)(4)(i).

[65]*Id.* § 1630.2(j)(4)(ii).

UPSF correctly points out there is limited evidence about the condition, manner, and duration of Diebold's limitations in major life activities. In a February 6, 2013 medical record, Diebold's occupational therapist noted that he "has progressed well in 5 visits and has improved hand and upper extremity function. . . . Strength and endurance are also more functional now and he is encouraged with progress."[66] Likewise, Diebold's physician, Dr. Scott, attested that the stroke "significantly impacted [Diebold's] Right Upper Extremities (RUE) including weakness, numbness, dystaxia, etc., in his right arm and hand," and that several consulting physicians were prescribed as part of his post-stroke care.[67] The EEOC's evidence supports that Diebold's major life activities of self-care, eating, writing, lifting, and gripping were immediately affected by the stroke. In contrast, UPSF points to evidence that his physical therapy ended for those issues after five sessions, and that he was released by his physician to work on February 6, 2013. He had no problems with job performance after he returned.

Although the EEOC's medical evidence is limited, when viewed in the light most favorable to the EEOC, it is sufficient for a reasonable jury to conclude that Diebold was substantially limited in the major life activities of self-care, eating, writing, lifting, and gripping.[68] However, the evidence falls short of what is necessary for the EEOC to meet its heavy summary judgment burden of demonstrating as a matter of law that Diebold's stroke

---

[66]Doc. 164-11.

[67]Doc. 164-10.

[68]The EEOC does not claim that driving is a major life activity limited by the stroke, and indeed, the Tenth Circuit has held that driving is not a major life activity. *Kellogg v. Energy Safety Servs. Inc.*, 544 F.3d 1121, 1126 (10th Cir. 2008). But a driving restriction "could create a disability . . . 'if it caused a [substantial] impairment of a major life activity,' such as working." *Avet v. Dart*, No. 14 C 4555, 2016 WL 757961, at *4 (N.D. Ill. Feb. 26, 2016) (quoting *Winsley v. Cook Cty.*, 563 F.3d 598, 604 (7th Cir. 2009)). The EEOC does claim that the stroke substantially limited the major life activity of working. But the Court should consider the major life activity of working only as a last resort. *Carter v. Pathfinder Energy Serv., Inc.*, 662 F.3d 1134, 1146 (10th Cir. 2011). Because the Court finds there is a triable issue as to several other major life activities, it makes no determination as to whether a reasonable jury could also find that Diebold was substantially limited in working. *See id.*

substantially limited his major life activities.  Thus, both parties' motions for summary judgment are denied as to whether Diebold had a record of disability on May 13 or December 6, 2013.

### 2. Regarded as Disabled

The ADAAA modified the scope of "regarded as" claims.  A "regarded as" impairment under § 12102(1)(C) need not limit or even be perceived as limiting a major life activity—the employer need only regard the employee as being impaired."[69]  To show that the employer regarded Diebold as having an impairment, the EEOC must show that (1) he has an actual or perceived impairment, (2) the impairment is neither transitory nor minor, and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action.[70]

#### a. Actual or Perceived Impairment

As the Court noted in its record-of-disability analysis, the EEOC has demonstrated that Diebold had an actual impairment in January 2013 when he had his stroke.  Moreover, a reasonable jury could conclude that the impairment includes a driving restriction that is based on a heightened risk of stroke recurrence.  Therefore, the EEOC has come forward with evidence sufficient to demonstrate that Diebold had an actual or perceived impairment.

#### b. Transitory and Minor

UPSF argues that Plaintiff's impairment was transitory and minor, therefore he cannot establish that he was regarded as disabled.  The Court assumes without deciding that Plaintiff

---

[69]*Sharp v. Owens Corning Insulating Sys., LLC*, No. 17-CV-2463-JWL, 2018 WL 3831527, at *7 (D. Kan. Aug. 13, 2018) (quoting *Adair v. City of Muskogee*, 823 F.3d 1297, 1305 (10th Cir. 2016)).

[70]*Adair*, 823 F.3d at 1306.

bears the burden of demonstrating that his impairment was not transitory and minor.[71]  Whether

an impairment is transitory and minor is an objective determination.[72]  The governing regulation

provides:

> A covered entity may not defeat "regarded as" coverage of an
> individual simply by demonstrating that it subjectively believed the
> impairment was transitory and minor; rather, the covered entity
> must demonstrate that the impairment is (in the case of an actual
> impairment) or would be (in the case of a perceived impairment)
> both transitory and minor. For purposes of this section, "transitory"
> is defined as lasting or expected to last six months or less.[73]

Although UPSF asserts that Diebold's impairment was transitory and minor, its briefing

only addresses the transitory component of the requirement.  The EEOC submitted evidence

sufficient to demonstrate that a stroke is not minor for purposes of this regulation.  A stroke is far

more serious than "common ailments like the cold or flu" that the EEOC has identified as

transitory and minor.[74]  To be sure, an impairment may be minor where the plaintiff "suffers an

acute injury and then makes a swift and complete recovery."[75]  But a stroke is not an acute injury

like a broken bone or heat stroke,[76] and the objective evidence in the record demonstrates that

even where a stroke is minor, there is an increased risk of recurrence for one year; it is "an

---

[71]*See Vannattan v. VendTech-SGI, LLC*, No. 16-cv-2147-JWL, 2017 WL 2021475, at *2 (D. Kan. May 12, 2017) (noting that the Tenth Circuit in *Adair* places the burden of proof on the plaintiff, whereas the statute and regulations appear to place the burden on the employer).

[72]20 C.F.R. § 1630.15(f).

[73]*Id.*

[74]29 C.F.R. Part 1630 app. (citing 2008 House Jud. Comm. Rpt. at 18); *see also Nevitt v. U.S. Steel Corp.*, 18 F. Supp. 3d 1322, 1333 n.6 (N.D. Ala. 2014).  To be clear, UPSF does not argue that stroke is a minor impairment; its argument focuses entirely on the transitory nature of Diebold's stroke.

[75]*Quick v. City of Fort Wayne*, No. 1:15-CV-056 JD, 2016 WL 5394457, at *3 (N.D. Ind. Sept. 27, 2016) (collecting cases).

[76]*See, e.g.*, *Willis v. Noble Envtl. Power, LLC*, 143 F. Supp. 3d 475 (N.D. Tex. 2015) (heat stroke and dehydration); *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259–60 (3d Cir. 2014) (broken finger).

important warning of a potentially severe stroke."[77]  There is no post-ADAAA law finding that a stroke necessitating a one-year driving restriction is minor.[78]

UPSF argues that Diebold's stroke only prevented him from working for three weeks; once he finished physical therapy, his physician released him to work and he drove without incident between February 6, 2013, and his DOT exam on April 29, 2013.  But the loss of Diebold's MEC is objective evidence that the stroke was not transitory as defined by the regulation.  He was not cleared to return to work after his April 29, 2013 exam, and was told that he must wait for one year after the stroke before the MEC could be reissued.  The DOT guidance on commercial driving after a stroke is based on objective medical guidance regarding the chance of recurrence.  The fact that Diebold's stroke ensured that he could not drive a commercial vehicle for one year is objective evidence that his impairment was not transitory—it was expected to last for longer than six months.[79]

### c.  UPSF's Awareness of Diebold's Impairment

The third requirement for a regarded-as disability is that UPSF was aware of and therefore perceived the impairment at the time of the alleged discriminatory action.[80]  The alleged discriminatory actions occurred on May 13 and December 6, 2013.  May 13, 2013, was the first day Diebold was denied full-time dock work under the CBA.  It is uncontroverted that

---

[77]Doc. 164-8 at 22.

[78]*Miller v. Coca-Cola Refreshments USA, Inc.*, No. 2:16CV93, 2018 WL 1456502, at *17 (W.D. Pa. Mar. 23, 2018) (finding lifting restriction associated with stroke transitory and minor where it was lifted and the plaintiff cleared to return to work six months after stroke).

[79]*See id.* (considering whether the lifting restriction following the plaintiff's stroke was transitory and finding it was where his restrictions were lifted after six months).  *Miller* considered the transitory nature of the lifting restriction associated with the plaintiff's stroke.  *Id.*  It does not, as UPSF suggests, stand for the proposition that "case law establishes that a stroke and its limited effects are transitory and minor."  Doc. 171 at 31.

[80]*EEOC v. STME, LLC*, 938 F.3d 1305, 1317 (11th Cir. 2019) ("for an employee to qualify as 'being regarded as' disabled, the employer must have perceived the employee as having a current existing impairment at the time of the alleged discrimination.").

on April 29, 2013, Diebold immediately notified his UPSF managers that the medical examiner did not renew his MEC. On this basis, Diebold was not allowed to work as a road driver because that job required a MEC. He was also prohibited from working on the dock full time because UPSF interpreted Article 21 § 2 of the CBA as applying to those whose CDL was "suspended or revoked" due to, for example, a DUI, but not to those who are medically disqualified. This is sufficient to present a genuine issue of material fact about whether UPSF perceived that Diebold had an impairment on May 13, 2013.

UPSF argues that it could not have perceived Diebold as disabled given that he returned to work with no restrictions for a period of time after his stroke and before his MEC examination. UPSF relies on evidence that Diebold did not believe he was disabled, did not have trouble performing his job, and did not require assistance to perform the functions of his job during this time period. Moreover, UPSF contends that if it perceived Diebold as disabled, it would not have continued to allow Diebold to perform the road driver position during that period of time. But the fact that UPSF may not have regarded Diebold as disabled prior to April 29, 2013, does not mean that it could not have regarded him as disabled after that date. UPSF's perception about Diebold's stroke prior to the adverse employment action is immaterial to the regarded-as inquiry.

Moreover, EEOC has come forward with strong evidence that UPSF perceived Diebold as impaired by the time it offered him the part-time position on December 6. UPSF encouraged Diebold to avail himself of UPSF's multistep ADA process when he complained about how the CBA was being applied to his situation on May 17. At Step 3 of the process, UPSF determined that Diebold met the definition of disability and proceeded to negotiate with the union and propose an accommodation. UPSF points to language in its proposal disclaiming that its offer

can be construed as an admission that Diebold meets the definition of disability. The waiver language is immaterial. First, this document is unsigned; Diebold rejected the offer. Second, the Court is not evaluating whether Diebold has an actual disability. Instead, the Court's analysis is limited to UPSF's perception of Diebold as having an impairment at the time of the adverse employment action. UPSF's emails about the CBA, coupled with the findings during Step 3 of the ADA process, could lead a reasonable jury to conclude that UPSF was aware of Diebold's impairment when it refused to let him work as a full-time dockworker on December 6, 2013.

### B.    Qualified Individual

This element of the discrimination claim requires the EEOC to demonstrate that Diebold is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."[81] UPSF argues that there is no genuine issue of material fact that Diebold was not qualified for the road driver position because he lacked a MEC. But the appropriate inquiry is whether Diebold was qualified to perform the essential functions of the dockworker position, i.e. "the job he desires." Whether the EEOC has satisfied this element of its prima facie case is a two-part inquiry: (1) "whether the plaintiff can perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue;"[82] and (2) "if we conclude that Plaintiff is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions."[83] The Tenth Circuit has made clear that this requirement is satisfied if the employee can perform

---

[81]42 U.S.C. § 12111(8).

[82]*Adair v. City of Muskogee*, 823 F.3d 1297, 1307 (10th Cir. 2016) (quoting *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 887 (10th Cir. 2015)).

[83]*Id.* (quoting *Hawkins*, 778 F.3d at 887).

the essential functions of an available reassignment job within the company, even if unable to perform his existing job.[84]

It is uncontroverted that Diebold's personal physician released him to work on February 6, 2013, and that the DOT medical examiner released him to work on the dock after his April 29, 2013 examination. UPSF has pointed to no evidence suggesting that Diebold was not qualified to work on the dock; in fact, it offered him a part-time dockworker position as part of its ADA process. The EEOC has established as a matter of law that Diebold is a qualified individual with respect to the full-time dockworker position.

### C. Causation

There is no dispute that UPSF's decision not to allow Diebold to perform full-time dock work was because he lost his MEC for medical reasons, rather than a legal reason such as an arrest or conviction for DUI. UPSF moves for summary judgment on the causation element of the EEOC's claim, arguing that its decisions were based on Diebold's lack of MEC, not disability. But as the Court has explained, a reasonable jury could conclude that Diebold's driving restriction is part of his impairment. Because UPSF's decisions not to permit Diebold full-time dock work under the CBA were based on his lack of a MEC, there is a genuine issue of material fact about whether his record of or perceived disability formed the basis of the alleged adverse employment actions on May 13 and December 6, 2013.

### IV. Conclusion

In sum, the EEOC has demonstrated that Diebold's stroke was an impairment as defined by the ADA, and that his impairment included a heightened risk of stroke recurrence. However,

---

[84]*Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1161 (10th Cir. 1999); *see Adair*, 823 F.3d at 1306–07 (explaining that the ADAAA "did not fundamentally change the qualification requirement.").

there is a genuine issue of material fact as to whether this impairment substantially limited Diebold's major life activities, such that by May 13 or December 6, 2013, he had a record of impairment. Furthermore, there is a genuine issue of material fact about whether the loss of Diebold's MEC caused UPSF to perceive that Diebold was impaired on those two dates. Because there is a genuine issue of material fact about whether Diebold is disabled under the statute, and whether UPSF's actions on May 13 and December 6, 2013 were because of Diebold's disability, summary judgment is inappropriate and both motions are denied.

**IT IS THEREFORE ORDERED BY THE COURT** that the parties' cross-motions for summary judgment (Docs. 116, 165) are **denied**. The Court will set this matter for a pretrial conference forthwith.

**IT IS SO ORDERED.**

Dated: March 2, 2020

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE